**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LIBRADO SOLANO, JR., | Case No.: 1:15-cv-00756-DAD-SAB (PC) |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| DR. HAROLD TATE, et al., | [ECF No. 31] |
| Defendants. | |

Plaintiff Librado Solano, Jr. is appearing pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.

Currently before the Court is Defendants' motion for summary judgment, filed April 13, 2017.

**I.**

**PROCEDURAL BACKGROUND**

This action is proceeding against Defendants Dr. Tate and Dr. Yin for deliberate indifference to a serious medical need in violation of the Eighth Amendment.

Defendants filed an answer to the complaint on November 3, 2015.

As previously stated, Defendants filed a motion for summary judgment on April 13, 2017. Plaintiff filed an opposition on July 24, 2017, and Defendants filed a reply on July 31, 2017.

///

///

1

## II.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In resolving cross-motions for summary judgment, the Court must consider each party's evidence. Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 960 (9th Cir. 2011). Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he must affirmatively demonstrate that no reasonable trier of fact could find other than for him. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984 (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

///

///

In arriving at this recommendation, the Court has carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

**III.**

**DISCUSSION**

Defendants Drs. Tate and Yin move for summary judgment, or in the alternative, summary adjudication, on the grounds that (1) they were not deliberately indifferent to Plaintiff's serious medical needs; and (2) Plaintiff did not sustain an injury that can be attributed to the doctors' alleged conduct.

**A.     Summary of Plaintiff's Complaint**

On June 11, 2013, Plaintiff was transferred to the California Correctional Facility Special Housing Unit in Tehachapi. (Compl. 4,[1] ECF No. 1.) During the intake examination, Plaintiff informed the medical staff that he had a hernia injury on the left side and testicular pain. (Id.) Plaintiff was advised that he would need to bring the issues to the attention of medical staff. (Id.)

On June 13, 2013, Plaintiff told a nurse at the clinic that he had a hernia injury and lump that were causing testicular pain and he had been prescribed medication and referred for surgery while housed at Folsom State Prison. (Id. at 4-5.) Plaintiff was advised that he would receive pain medication that evening. (Id. at 5.) Plaintiff did not receive any pain medication and submitted a Health Care Request. (Id.)

After being informed that he would not receive any pain medication until he was seen by a doctor, Plaintiff was seen by Dr. Thomas Bingamon on June 27, 2013. (Id. at 5.) Dr. Bingamon informed Plaintiff that his hernia surgery had been approved and that an appointment had to be made with the surgeon. (Id.) Plaintiff asked if he could receive a different pain medication because the

---

[1] All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

3

Naproxen was not helping.  (Id.)  Dr. Bingamon refused to change Plaintiff's medication and told him to "hang in there."  (Id.)

On June 30, 2013, Plaintiff filed an inmate appeal seeking a change in his pain medication. (Id. at 5.)  Plaintiff saw the surgeon on July 2, 2013 and was advised that his surgery would take place within two months.  (Id.)

On July 9, 2013, Dr. Tate interviewed Plaintiff in regards to his inmate appeal.  (Id. at 5.) Plaintiff told Dr. Tate that the pain medication was not helping the severe pain from the hernia and testicle; and he needed better pain control while he waited for surgery.  (Id.)  Dr. Tate refused to change the medication and informed Plaintiff that he would be okay.  (Id.)

On October 4, 2013, Plaintiff had still not received surgery and submitted a Health Care Request to discover the status of his surgery and complain about the hernia and testicular pain.  (Id. at 5.)  Plaintiff saw Dr. Tate on October 21, 2013.  (Id.)  Dr. Tate threatened to take Plaintiff off his Naproxen for abusing pain medications.  (Id.)  Plaintiff alleges that Dr. Tate refused to allow him to discuss his medical condition which was getting worse and causing more pain.  (Id.)

Plaintiff underwent surgery on December 6, 2013 and was discharged that same day.  (Id. at 6.) On December 14, 2013, Plaintiff had a sneezing attack and the incision site began to swell up and cause severe pain.  (Id.)  Several hours later, Plaintiff was taken to the Medical Clinic and was seen by Dr. Allan J. Yin.  (Id.)  Dr. Yin informed Plaintiff that his sneezing had caused the mesh to come apart causing internal bleeding and surgery would be needed.  (Id.)  Plaintiff asked to be sent to the hospital because the pain and swelling was increasing.  (Id.)  Dr. Yin refused to send Plaintiff to the hospital, but prescribed two Ibuprofen for pain and sent Plaintiff back to his cell stating that he would check on Plaintiff later.  (Id.)  Five hours later, Plaintiff woke up soaked in blood from the incision site.  (Id.) Plaintiff was taken to the hospital by ambulance.  (Id.)

On December 17, 2013, Plaintiff returned from the hospital.  (Id. at 6.)  The following morning Plaintiff was to be seen by Dr. Tate and told correctional officers that he was not able to walk and needed a wheelchair.  (Id.)  The officers told Plaintiff that they would check on a wheelchair, but never returned.  (Id.)  On December 19, 2013, Plaintiff was escorted to the medical clinic for an appointment.  (Id.)  Plaintiff saw Dr. Tate who informed Plaintiff that the only reason the incision

would have reopened was if Plaintiff cut it open himself.  (Id.)  Dr. Tate examined the incision and told Plaintiff that the appointment was over.  (Id.)  Plaintiff told Dr. Tate that he was afraid to walk back to the housing unit because he had been on bed rest and could fall.  (Id.)  Dr. Tate told Plaintiff that if he fell the correctional officers would pick him up.  (Id.)  Plaintiff had to walk back to his cell "in severe agony and pain."  (Id.)

## B.    Defendants' Objections to Plaintiff's Declaration

Defendants object to Plaintiff's declaration submitted in response to their declarations. "[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself, and are thus "redundant" and unnecessary to consider here.  Burch v. Regents of Univ. of California, 433 F.Supp.2d 1110, 1119 (E.D. Cal. 2006); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.").  Thus, the Court does not consider such objections, and will only address the objections that are considered relevant and material to resolving the instant motion.

## C.    Statement of Undisputed Facts

1.     At all times relevant to his claims, Plaintiff was incarcerated at California Correctional Institution ("CCI").  (ECF No. 1, Compl. at pg. 4-7; Jeffery Decl., ¶ 2, Ex. A, Dep. at 8:6-11.)

2.     On May 20, 2013, Plaintiff's primary care physician at Folsom State Prison ("Folsom") diagnosed Plaintiff with a left inguinal hernia.  Plaintiff's physician advised him to use a hernia belt and to avoid heavy lifting.  (Feinberg Decl. ¶ 10, Ex. C.)

3.     Plaintiff's doctor at Folsom also submitted a referral for Plaintiff to consult with a surgeon to schedule a "routine" hernia repair surgery.  On May 23, 2013, the referral for the routine surgery consult was approved at Folsom.  (Feinberg Decl. ¶ 10, Ex. D.)

4.     A referral that is characterized as "routine" is one in which the service is provided within 90 calendar days of an order.  (Feinberg Decl. ¶ 10, fn. 2.)

5.     On June 11, 2013, Plaintiff transferred from Folsom to CCI.  (Compl. at pg. 4; Feinberg Decl. ¶ 10, Ex. E.)

6.     Upon his arrival at CCI, Plaintiff was first examined by a physician assistant on June

27, 2013. The physician assistant ("PA") noted Plaintiff's left-sided hernia and described it as slightly tender. The PA also provided Plaintiff with a prescription for Naproxen, an anti-inflammatory. The exam note also documented that prior to his transfer to CCI, Plaintiff had been approved for a left hernia repair. The PA indicated that Specialty Services would be contacted regarding the approval. (Feinberg Decl. ¶ 10, Ex. G.)

7.    On July 2, 2013, Plaintiff consulted with off-site surgeon Michael A. Michael regarding the hernia procedure. Dr. Michael agreed to perform the surgery and issued an order for a "left inguinal hernia repair with mesh." In his notes, Dr. Michael made no indication of surgical urgency. Nor did he recommend additional pain medication. (Feinberg Decl. ¶ 10, Exs. H, I, J; Tate Decl. ¶ 5.)

8.    Dr. Tate first examined Plaintiff on July 9, 2013. Plaintiff complained of left-sided inguinal hernia pain and pain in his right testicle. He requested morphine to replace the Naproxen he was taking and sought the status of the hernia procedure. (Feinberg Decl. ¶ 10, Ex. K; Tate Decl. ¶¶ 6-7, Ex. A.)

9.    Prior to the July 9, 2013 examination, Dr. Tate reviewed Plaintiff's medical records and learned that Plaintiff had recently been diagnosed with a left-sided hernia and that he met with a surgeon regarding an approved routine surgery repair. Dr. Tate also reviewed Plaintiff's medication profile. (Tate Decl. ¶¶ 4-5.)

10.   During the July 9, 2013 exam, Dr. Tate noted Plaintiff's abdomen was flat and normally active. He also measured the hernia and noted that it was mild to moderately tender upon palpitation. Dr. Tate also saw that Plaintiff had a small hydrocele on his right testicle. Plaintiff denied having fever, nausea, vomiting or blood in his stool. (Feinberg Decl. ¶ 10, Ex. K; Tate Decl. ¶¶ 6-7, Ex. A.)

11.   On July 9, 2013, Dr. Tate concluded that Plaintiff's condition did not medically indicate a prescription for morphine. (Tate Decl. ¶¶ 4-7, Ex. A.)

12.   At the July 9, 2013 exam, Dr. Tate told Plaintiff that he would not prescribe morphine and recommended that Plaintiff continue to take Naproxen twice a day in conjunction with the Docusate Sodium. (Feinberg Decl. ¶ 10, Ex. K; Tate Decl. ¶ 7, Ex. A.)

13. In the July 9, 2013 consult, Dr. Tate also updated Plaintiff on the status of the hernia procedure. Dr. Tate explained that Dr. Michael had agreed to perform the hernia surgery that had been approved at Folsom and he advised Plaintiff that routine referrals may take up to three months just to schedule. (Feinberg Decl. ¶ 10, Ex. K; Tate Decl. ¶¶ 7-8, Ex. A.)

14. Dr. Tate concluded that he had no reason to recommend upgrading the procedure from routine to priority. (Tate Decl. ¶¶ 4-8, Ex. A.)

15. Dr. Tate next examined Plaintiff on September 6, 2013. Plaintiff requested stronger medication for hernia pain and a stool softener. During the exam, Plaintiff reported escalating pain and painful bowel movements. He also said that he had run out of the Naproxen and Docusate Sodium. (Feinberg Decl. ¶ 10, Ex. L; Tae Decl. ¶¶ 9-10, Ex. B.)

16. Dr. Tate's examination on September 6, 2013 revealed that Plaintiff's abdomen protruded but was normally active and non-tender. Dr. Tate concluded that Plaintiff's condition did not medically indicate a stronger pain medication and the doctor did not change the pain prescription. (Feinberg Decl. ¶ 10, Ex. L; Tate Decl. ¶¶ 9-10, Ex. B.)

17. Dr. Tate also reviewed Plaintiff's medication profile on September 6, 2013 and noted that the prescriptions for Naproxen and Docusate Sodium remained active. Dr. Tate concluded that Plaintiff had not been taking the medications as prescribed and counseled Plaintiff on the proper intake of the medications. (Feinberg Decl. ¶ 10, Ex. L; Tate Decl. ¶ 10, Ex. B.)

18. Dr. Tate examined Plaintiff on October 21, 2013. Plaintiff claimed that he ran out of pain pills and requested a refill of Naproxen prescription. Plaintiff also complained of left groin pain. Dr. Tate's examination revealed that Plaintiff's abdomen remained non-tender, normally active and protuberant. There were no signs of a mass or infection and he did not appear in distress. (Feinberg Decl. ¶ 10, Ex. M; Tate Decl. ¶ 11, Ex. C.)

19. On October 21, 2013, Dr. Tate reviewed Plaintiff's medication profile and discovered that it was too soon for the Naproxen supply to have been exhausted. Dr. Tate denied the refill requested and counseled Plaintiff on the proper use of the medication. Dr. Tate warned Plaintiff that excessive use of an anti-inflammatory can cause gastric bleeding. (Feinberg Decl. ¶ 10, Ex. M; Tate Decl. ¶ 11, Ex. C.)

20. Following the October 21, 2013 examination, Dr. Tate inquired as to the status of the left hernia repair procedure. Dr. Tate learned that the hernia repair, which had been approved at Folsom, did not go through the proper channels, and was never communicated to Specialty Services at CCI. (Tate Decl. ¶ 12.)

21. On October 29, 2013, Dr. Tate submitted a physician request for Plaintiff to meet with the surgeon to re-initiate the scheduling process. In the request, Dr. Tate requested that the consult be expedited and scheduled within 30 days. The request was approved on October 30, 2013. (Feinberg Decl. ¶ 10, Ex. N; Tate Decl. ¶ 12, Ex. D.)

22. Dr. Tate examined Plaintiff on November 14, 2013. During the exam, Dr. Tate explained to Plaintiff the communication breakdown regarding the scheduling of the hernia procedure. Dr. Tate told Plaintiff that he submitted an expedited request to facilitate the surgery appointment so that the procedure could be scheduled by Specialty Services. (Feinberg Decl. ¶ 10, Ex. O; Tate Decl. ¶ 13, Ex. E.)

23. On November 14, 2013, Dr. Tate examined Plaintiff and found that his condition remained unchanged and there was no basis to prescribe a stronger medication or upgrade the routine surgery to a different priority level. (Feinberg Decl. ¶ 10, Ex. O; Tate Decl. ¶ 13, Ex. E.)

24. On December 6, 2013, Plaintiff had the left inguinal herniorrhaphy at San Joaquin Community Hospital and was discharged the same day. Compl. at p. 6.)

25. When Plaintiff returned from the hospital on December 6, 2013, the Return from Off-Site Medical form documented that Plaintiff's dressing was dry and intact, that he was able to ambulate with ease and had a steady gait. Plaintiff complained of throbbing pain in his groin area, which he rated at level 9 out of 10. Dr. Hirsch prescribed Tylenol #3, an opiate pain medication containing codeine, to be taken twice a day for one week. Plaintiff was also given Fibertabs and Colace. He also had an active prescription for Naproxen. (Feinberg Decl. ¶ 10, Exs. P, Q.)

26. Dr. Tate evaluated Plaintiff on December 10, 2013. The progress note documented that Plaintiff was doing well, that the incision site looked good and the dressing remained intact with no bleed-through. The note also documented that Plaintiff denied having blood in his stools, fever or chills and that he rated his pain between 5 to 7 on a scale of 10. (Feinberg Decl. ¶ 10, Exs. R, S; Tate

8

Decl. ¶ 14, Ex. F.)

27.     At the December 10, 2013 exam, Dr. Tate advised Plaintiff to continue his pain regimen of Tylenol #3 and Naproxen and advised Plaintiff on self-care.  Dr. Tate also executed an order for Plaintiff to meet with his surgeon in 7-10 days.  (Feinberg Decl. ¶ 10, Exs. R, S; Tate Decl. ¶ 14, Exs. F, G.)

28.     On December 14, 2013, at 5:35 p.m., Plaintiff went to the medical clinic complaining of pain in his groin area.  The nurse documented that the surgical site was clean and dry, that the steri strips were intact and that there was no drainage.  The nurse also noted Plaintiff had some swelling at the surgery site.  At 6:05 p.m., the nurse contacted Dr. Yin, the on call physician, and documented that Dr. Yin was returned to CCI to evaluate Plaintiff.  (Feinberg Decl. ¶ 10, Exs. T. U.)

29.     Dr. Yin began his examination of Plaintiff at 6:41 p.m.  In his exam notes, Dr. Yin documented that Plaintiff was eight days post-surgery from a left inguinal herniorrhaphy, and that Plaintiff complained of painful swelling in his groin area, which Plaintiff claimed began following a sneezing attack.  The progress notes documented that Plaintiff's left groin was notable for a non-fluctuant, 4X7 cm mildly tender swelling area and that Plaintiff did not have a fever.  (Feinberg Decl. ¶ 10, Ex. V; Yin Decl. ¶¶ 4-6, Ex. A.)

30.     Dr. Yin instructed Plaintiff to rest overnight and refrain from engaging in any straining activities.  Dr. Yin also instructed Plaintiff to continue taking Tylenol #3 to alleviate pain, and renewed this prescription because it had expired the day before.  The doctor also instructed Plaintiff to continue taking the Colace and Fiber-Lax.  (Feinberg Decl. ¶ 10, Exs. V, W; Yin Decl. ¶¶ 407; Exs. A, C.)

31.     Dr. Yin documented that he would return the following morning to evaluate Plaintiff's status and executed a physician order to facilitate this examination.  Dr. Yin also ordered an appointment for Plaintiff to meet with his primary care provider in two days, and noted that Plaintiff already had a December 10, 2013 order to see the surgeon in 7 to 10 days from the order date.  (Feinberg Decl. ¶ 10, Exs. V, W, X; Yin Decl. ¶¶ 4-8, Exs. A, B.)

32.     On December 15, 2013, at approximately 1:40 a.m., Dr. Yin received a telephone call from a nurse at CCI stating that Plaintiff had returned to the clinic and that he was complaining of pain

and had bleeding through the incision site. Dr. Yin instructed the nurse to make arrangements for Plaintiff to be transported to San Joaquin Community Hospital, and to start an IV so that IV access would be available, if needed. (Feinberg Decl. ¶ 10, Exs. Y, Z; Yin Decl. ¶ 9, Ex. D.)

33. At the hospital, Plaintiff's surgeon performed an evacuation of a left inguinal hematoma and a ligation of a bleeding vessel. Plaintiff was discharged from the hospital on December 17, 2013. (Feinberg Decl. ¶ 10, Exs. AA, CC.)

34. The December 16, 2013 hospital record advised Plaintiff to ambulate three times a day. (Feinberg Decl. ¶ 10, Ex. BB.)

35. The December 17, 2013 Return from Off-site Medical Care form documented that Plaintiff's surgical dressing was intact and that there were no visible signs of drainage. Plaintiff was also described as being stable and ambulatory, with a steady gait. (Feinberg Decl. ¶ 10, Ex. DD.)

36. On December 18, 2013, Dr. Tate and licensed vocational nurse, Kimberly Hutto, witnessed and signed a CDC 7225 refusal of treatment form. (Tate Decl. ¶ 15, Ex. H; Hutto Decl. ¶ 4, Ex. A.)

37. CDCR policy requires two people to witness and execute a refusal form documenting that an inmate declines treatment. (Hutto Decl. ¶ 2.)

37. On December 18, 2013, Dr. Tate completed a progress note rescheduling the missed appointment. (Feinberg Decl. ¶ 10, Ex. FF; Tate Decl. ¶ 15, Ex. I.)

38. Plaintiff asserts that during a December 19, 2013 examination, Dr. Tate made Plaintiff walk back to his cell without the aide of a wheelchair, despite the fact that he had undergone hematoma evacuation surgery four days earlier. (Compl. at p. 6.)

39. On December 19, 2013, Plaintiff was seen by a nurse. The progress note documents that the nurse informed Plaintiff that the hospital records advised him to walk. Plaintiff was also informed that if he believed he could not ambulate and required additional assistance, he could be placed in the Outpatient Housing Unit, which provided housing for inmates that require higher levels of medical care. The note documents that Plaintiff declined the extra care and stated he would be fine walking. (Feinberg Decl. ¶ 10, Ex. GG.)

40. The December 16, 2013 hospital record documents that Plaintiff should walk three

10

times a day.  (Feinberg Decl. ¶ 10, Ex. BB.)

41.    Plaintiff testified that but for the immediate pain in doing so, he suffered no long term harm from having to walk back to his cell on December 19, 2013.  (Jeffery Decl. ¶ 2; Ex. A, Pl. Dep. at 62:6-16.)

42.    On December 20, 2013 a nurse documented that Plaintiff's dressing was clean, dry and intact, and the staples remained in place.  Plaintiff had no redness, drainage or swelling and no sign of infection.  (Feinberg Decl. ¶ 10, Ex. HH.)

43.    A December 26, 2013 progress note indicates that the surgery site was intact and Plaintiff had no redness, drainage or swelling and no sign of infection.   Plaintiff reported no pain, was stable and ambulated without difficulty.  (Feinberg Decl. ¶ 10, Ex. II.)

44.    Morphine is highly addictive and over time patients develop a tolerance, which causes them to demand higher doses of the narcotic in order to achieve the same level of efficacy.  (Tate Decl. ¶ 7.)

45.    Within CDCR, the scheduling of approved procedures are handled by the Specialty Services.  (Tate Decl. ¶¶ 12, 19.)

46.    Had Dr. Yin sent Plaintiff to the hospital at the time of the initial examination on the evening of December 14, 2013, there would have been no difference in the outcome.  (Feinberg Decl. ¶¶ 10, 16-23; Exs. P-CC; Yin Decl. ¶¶ 4-11.)

**D.    Findings on Defendants' Motion**

While the Eighth Amendment of the United States Constitution entitles Plaintiff to medical care, the Eighth Amendment is violated only when a prison official acts with deliberate indifference to an inmate's serious medical needs.  Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent."  Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096).  Deliberate indifference is shown by "(a) a purposeful act or failure to respond

to a prisoner's pain or possible medical need, and (b) harm caused by the indifference." Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096). The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care. Snow, 681 F.3d at 985 (citation and quotation marks omitted); Wilhelm, 680 F.3d at 1122.

It is well established that deliberate indifference may be shown when prison official ignore express orders from a prisoner's treating physician. See Estelle, 429 U.S. at 104-105 (deliberate indifference may manifest "by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed"); Colwell v. Bannister, 763 F.3d 1060, 1068-1069 (9th Cir. 2014) (reiterating that prison's reliance on non-specialist prison physicians' opinions who make decisions based on policy, rather than specialists contradictory opinions, satisfies deliberate indifference standard); Snow, 681 F.3d at 988 (non-treating, non-specialist physicians may have been deliberately indifferent to prisoner's needs when they repeatedly denied outside specialists' recommendations for hip-replacement surgery); Jett, 439 F.3d at 1097-1098 (prison doctor may have been deliberately indifferent to a prisoner's medical needs when he decided not to request an orthopedic consultation as the prisoner's emergency room doctor had previously ordered); Lopez v. Smith, 203 F.3d 1122, 1132 (9th Cir. 2000) (a prisoner may establish deliberate indifference by showing that a prison official intentionally interfered with his medical treatment); Wakefield v. Thompson, 177 F.3d 1160, 1165 & n.6 (9th Cir. 1999) ("a prison official acts with deliberate indifference when he ignores the instructions of the prisoner's treating physician or surgeon."). In order to show a deliberate-indifference claim premised on delay, an inmate must demonstrate that the delay led to further injury. Trask v. Abanico, No. CV-08-1695, 2011 WL 3515885, at *5 (N.D. Cal. 2011) (citing Hallett v. Morgan, 296 F.3d 732, 746 (9th Cir. 2008)).

As an initial matter, Defendants do not argue that Plaintiff's hernia condition did not present an objectively serious medical need and therefore, the Court's focus is limited to whether Defendants acted with deliberate indifference to Plaintiff's hernia condition.

///

///

1.   <u>Defendant Dr. Tate</u>

a.   **Failure to Prescribe Morphine**

It is undisputed that on May 20, 2013, Plaintiff's primary care physician at Folsom diagnosed Plaintiff with a left inguinal hernia.[2] (UDF[3] 2.) Plaintiff's physician advised him to use a hernia belt and to avoid heavy lifting. (UDF 2.) The doctor also submitted a referral for Plaintiff to consult with a surgeon to schedule a "routine" hernia repair surgery. A referral that is characterized as "routine" is one in which the service is provided within 90 calendar days of an order.[4] (UDF 3-4.) On May 23, 2013, the referral for the routine surgery consult was approved at Folsom. (UDF 3.)

On June 11, 2013, Plaintiff was transferred from Folsom to CCI. (UDF 5.) At the time of his transfer, the medical screening form noted Plaintiff's hernia issue and stated that he had active prescriptions for Docusate Sodium, a stool softener, as well as the asthma inhalers Flovent and Levalbuterol. (Feinberg Decl. ¶ 10, Exs E & F.) When Plaintiff arrived at CCI, he was first examined by a physician assistant on June 27, 2013. (UDF 6.) The physician assistant noted Plaintiff's left-sided hernia and described it as slightly tender. Plaintiff was provided with a prescription for Naproxen, an anti-inflammatory. (UDF 6.) The exam note also documented that prior to his transfer to CCI, Plaintiff had been approved for a left hernia repair. The PA indicated that Specialty Services would be contacted regarding the approval.[5] (UDF 6.)

On July 2, 2013, Plaintiff consulted, by telemed, with off-site surgeon Michael A. Michael regarding the hernia procedure. Dr. Michael agreed to perform the surgery and issued an order for a "left inguinal hernia repair with mesh." Plaintiff contends that Dr. Michael told him the hernia surgery would be performed in two months. (Compl. at p. 5.) In his notes, Dr. Michael did not indicate the

---

[2] On April 24, 2013, Plaintiff had right inguinal hernia surgery. He healed well from that procedure. Soon after the surgery, Plaintiff began to complain of pain on his left side. (Feinberg Decl. ¶ 10, Ex. B.)

[3] "UDF" denotes the Statement of Undisputed Facts set forth above in section C.

[4] As for specialty medical services, aside from "routine" services, there are two other frames in which a service may be characterized. Emergent is for a patient who needs to be transferred to a higher level of care within 4 hours, such as sent by ambulance to an emergency room. Urgent is for a specialty evaluation, procedure or study that needs to be completed within 14 days. (Feinberg Decl. ¶ 10 fn. 2.)

[5] Specialty Services handles the scheduling of surgeries and other procedures. (UDF 46.)

level of surgical urgency, nor did he recommend additional pain medication. (UDF 7.)

Although Plaintiff requested morphine, it is a narcotic that is medically indicated to treat trauma and aggressive pain such as that associated with cancer and battle field injuries. Defendants submit the expert opinion of Dr. Feinberg who opines that Dr. Tate's decision to decline Plaintiff's request for morphine and other more potent medications to replace the prescribed Naproxen while awaiting hernia surgery was appropriate. (Feinberg Decl. ¶ 13.) Dr. Feinberg indicates that in general an inguinal hernia is uncomfortable but does not cause significant pain during routine day to day activities and only becomes more painful with certain straining activities such as heavy lifting, coughing, or performing sit ups. Furthermore, Plaintiff's symptoms did not warrant a narcotic. (Id.) Dr. Tate consistently described the hernia as either non-tender or only mildly tender, which is an indication that the condition and resulting pain were not severe. In addition, Plaintiff's condition and symptoms remained the same over a period of months without escalation which is another indication of a less severe condition. (Id.) Moreover, Dr. Michael, Plaintiff's surgeon, made no notation that Plaintiff's condition was urgent or that his condition required more immediate attention. Nor did Dr. Michael prescribe or indicate that Plaintiff required stronger pain medication. (Feinberg Decl. ¶ 14.) In addition, morphine has significant risks and negative long term side effects because it is highly addictive an over-time patients develop a tolerance, which causes them to demand higher doses of the narcotic in order to achieve the same level of efficacy. (UDF 46.) As a lay witness, Plaintiff is not qualified to render an opinion that Defendant should have considered other classes or types of pain medication, and that Defendant's failure to do so was in contravention of acceptable medical standards. Fed. R. Evid. 701, 702. The fact that Plaintiff believes he should have been prescribed morphine does not amount to deliberate indifference. Indeed, a difference in medical opinion between a lay prisoner and medical personnel regarding pain medication is insufficient to give rise to a constitutional violation. Alford v. Gyaami, No. 2:13-cv-2143 DAD P, 2015 WL 3488301, at *9-10 fn. 3 (E.D. Cal. June 2, 2015); see also Parlin v. Sodhi, No. 10-6120 VBF (MRW), 2012 WL 5411710, at *4 (C.D. Cal. Aug. 8, 2012). Accordingly, Dr. Tate is entitled to summary adjudication on this claim.

///

///

### b. Failure to Examine Plaintiff

In his complaint, Plaintiff contends that Dr. Tate did not examine him. However, in his opposition, Plaintiff limited this claim to July 9, 2013.

In his opposition, Plaintiff submits that on July 9, 2013, he was interviewed by Dr. Tate regarding an inmate appeal filed on June 30, 2013, for the denial of additional pain medication. Plaintiff contends that despite Dr. Tate's progress notes, he failed to conduct a physical examination of Plaintiff on this date. However, the medical records submitted by Dr. Tate belie Plaintiff's claim.

Dr. Tate first examined Plaintiff on July 9, 2013. At that time, Plaintiff was complaining of left-side inguinal hernia pain and pain in his right testicle. Plaintiff specifically requested to replace the recently prescribed Naproxen medication with morphine. Plaintiff also sought the status of the hernia procedure. (UDF 8.) Prior to the examination, Dr. Tate reviewed Plaintiff's medical records and learned, among other things, that Plaintiff had recently been diagnosed with a hernia on his left side, and that he had met with a surgeon to schedule a routine surgery repair. Dr. Tate also reviewed Plaintiff's medication profile. (UDF 9.)

During the exam, Dr. Tate noted Plaintiff's abdomen was flat and normally active. He also measured the hernia and noted that it was mild to moderately tender upon palpitation. Dr. Tate also saw that Plaintiff had a small hydrocele on his right testicle. Dr. Tate's observations could not have been noted if he had not physically examined Plaintiff. Furthermore, the September 6, 2013, October 21, 2013, and November 14, 2013, progress note similar assessments by Dr. Tate regarding Plaintiff's symptoms and hernia condition. In addition, at the December 10, 2013 exam, which took place four days after Plaintiff's left inguinal herniorrhaphy, Dr. Tate noted that Plaintiff had a flat abdomen with moderate tenderness without rebound, the surgical site dressing was dry, and Plaintiff had bruising extending to his scrotum. (Tate Decl. ¶ 14.) Dr. Tate opined that morphine was not warranted and recommended that Plaintiff continue to take Naproxen twice a day for pain in conjunction with the Docusate Sodium, which would help to avoid abdominal straining. (Tate Decl. ¶ 7.)

However, even assuming as Plaintiff contends that Dr. Tate failed to examine him on July 9, 2013, Plaintiff has failed to establish any resulting harm. Plaintiff's opposition fails to address the consequence of the failure to have a physical examination on this day. Furthermore, just days prior to

July 9, 2013, Plaintiff had been examined by two other medical provides, who neither found Plaintiff's condition to be urgent or to warrant an increase in pain medication. More specifically, and as previously stated above, on June 27, 2013, Plaintiff was assigned by physician assistant Bingamon who determined Plaintiff's condition was stable and denied a request to prescribe stronger pain medication. (UDF 6.) On July 2, 2013, Plaintiff's surgeon, found that a "routine" surgery was warranted, neither found Plaintiff's condition to be urgent or to warrant a medication change. (UDF 7.) In sum, Plaintiff's claim relating to the alleged failure to conduct a physical examination of him on July 9, 2013, relates strictly to his request for morphine which does not give rise to a claim for deliberate indifference, and Dr. Tate is entitled to summary adjudication on this claim.[6]

### c. Delay in Plaintiff's Surgery

Plaintiff claims that Dr. Tate intentionally delayed his surgery. In his opposition, Plaintiff contends that CCI lied when it represented in a December 5, 2013, memorandum that the scheduling of his surgery was delayed due to a clerical error after his transfer from Folsom to CCI. (Opp'n at 11.) Plaintiff argues this cannot be true because CCI was aware of Plaintiff's pending surgery because both PA Bingamon and Dr. Michael discussed the surgery with Plaintiff in June and July 2013, after Plaintiff had transferred to CCI. However, Plaintiff overlooks the fact that it is undisputed that within the CDCR, the scheduling of approved procedures are handled by Specialty Services an independent branch at each individual institution. (UDF 45.) Indeed, upon Plaintiff's transfer to CCI, PA Bingamon acknowledged the surgery request and questioned whether Specialty Services at CCI had been notified of the procedure. (ECF No. 31-3; Feinberg Decl. ¶ 10, Ex. G [June 27, 2013, progress note by PA Bingamon indicating: "Prior to transfer here, a Request for Services (RFS) for a left-sided hernia repair was submitted and was approved. It is not clear whether Specialty at CCI is aware of this yet."].) In addition, a doctor, such as Dr. Tate, may intervene by indicating the priority level of a

---

[6] Even if Plaintiff is attempting to contend that Dr. Tate failed to conduct examinations at the September 6, 2013, October 21, 2013, November 14, 2013, and December 10, 2013 exam dates, such claims are belied by the medical records submitted by Defendant. Dr. Tate has submitted progress notes for each of these exam dates which include detailed assessment of Plaintiff's condition, and Plaintiff has failed to present any evidence to the contrary. Accordingly, there is no dispute that physical examinations were performed on these dates. (ECF No. 31-2, UDF 15, 18, 22, 26.)

procedure-emergent, urgent or routine. (UDF 3.) A "routine" evaluation, procedure or study is generally completed within 90 days. (UDF 4.)

During Dr. Tate's first examination of Plaintiff on July 9, 2013, he believed that Plaintiff's surgery was in the process of being scheduled. (UDF 9, 13.) Indeed, at the July 9, 2013, examination, Plaintiff had previously been approved for a routine hernia repair while incarcerated at Folsom, and on July 2, 2013, Plaintiff meet with the surgeon (Dr. Michael) who agreed to perform the surgery. (UDF 3, 7.) Thus, at the July 9, 2013, exam, Dr. Tate advised Plaintiff that the surgery had been approved and it could take up to three months just to schedule the procedure. (UDF 13.)

The fact that Dr. Tate did not change the priority level of the surgery does not demonstrate deliberate indifference. The medical records before the Court demonstrate that during the July 2013 and subsequent examinations there was no need for advancing the priority level from "routine." (UDF 14; Feinberg Decl. ¶ 10, Exs. BB-JJ.) Furthermore, in October 2013, Dr. Tate inquired about the procedure status and learned that due to a breakdown in communication between the prisons during transfer, the surgery had not been properly scheduled. Dr. Tate promptly submitted a physician order to ensure a surgery consult so the procedure could be scheduled and also requested the consult be expedited. (UDF 20, 21.) It is undisputed that a routine surgery can take up to three months just to schedule the surgery, and while Plaintiff was awaiting surgery Dr. Tate took steps to alieve Plaintiff's pain, and when Dr. Tate realized the surgery was not actually scheduled he promptly submitted a physical order for the surgery procedure to be expedited. (UDF 9-13, 17-21.) While there was a delay in Plaintiff's hernia surgery after his transfer from Folsom to CCI, Plaintiff has adduced no evidence demonstrating that the delay from July 2013 to December 6, 2013, was the result of deliberate indifference by Dr. Tate rather than, at most, mere negligence. Accordingly, Dr. Tate is entitled to summary adjudication on this claim.

### d. Forged Refusal of Treatment Form on December 18, 2013

Plaintiff's contends that Dr. Tate forged a refusal of treatment form on December 18, 2013, despite the fact he did not refuse treatment and did not sign the refusal form. Plaintiff contends that on December 18, 2013, he requested the transport officers to allow the use of a wheelchair in order to be transported to the clinic for his medical examination. Plaintiff contends that transportation officers

informed him they would ask Dr. Tate but never returned.

It is undisputed that CDCR policy requires two people to witness and execute a refusal form documenting that an inmate declines treatment. (UDF 37.) In this instance, Dr. Tate and licensed vocational nurse Kimberly Hutto, signed and witnessed the refusal of treatment form. (UDF 36.) Dr. Tate further declares the following:

> On December 18, 2013, [Plaintiff] appeared on my patient list as one of the inmates with whom I had an appointment. I learned, however, that he was refusing to come to the clinic. When an inmate fails to show up at the clinic it is my own practice to personally go to the inmate's cell to confirm that the inmate is actually declining treatment. In this case, I personally communicated with Mr. Solano and confirmed that he was refusing to be treated. Thereafter, I proceeded to execute a CDC 7225 "Refusal of Examination And/Or Treatment form. I also made a notation to reschedule the missed appointment. Attached as Exhibits H and I are true and correct copies of the CDC 7225 I completed and my December 18, 2013 progress note with the notation to reschedule the missed appointment.

(Tate Decl. ¶ 15.)

Notwithstanding, Dr. Tate submitted a request to reschedule Plaintiff's missed appointment. (UDF 37.) Thus, there is no evidence that Dr. Tate was deliberately indifferent to Plaintiff's serious medical needs on December 18, 2013.

Plaintiff submits his declaration and the declarations of two other inmates in support of his claim that Dr. Tate forged a refusal of treatment form and denied Plaintiff treatment on December 18, 2013. (Opp'n, Ex. 22.) However, these declarations merely establish that Plaintiff did not tell the transport officers that he was refusing medical care.

In any event, even if Dr. Tate (and Nurse Hutto) forged the "Refusal of Examination" form, and denied Plaintiff medical care on December 18, 2013, Plaintiff has failed to establish any harm. Indeed, Plaintiff's declaration is silent as to how his condition was adversely affected as a result of the "missed" exam. Furthermore, the medical records documenting Plaintiff's condition, both immediately before and after December 18, 2013, demonstrate that Plaintiff's condition after surgery was stable and there were no complications. (Feinberg Decl. ¶ 10, Exs. CC, DD, GG [December 17, 2013, San Joaquin Community Hospital Discharge Report describes Plaintiff as "stable, eating well, … denies any pain on the surgical incision site…the surgical site is clean and dry and no complications"; December 17, 2013 CCI "Return From Off Site Medical Care" form states "no acute

18

sx" and Plaintiff is "stable and ambulatory"; December 19, 2013 CCI progress note by nurse reports no complications post-surgery].) Accordingly, even viewing the facts in the light most favorable to Plaintiff, and assuming he did not receive medical care on December 18, 2013, as he claims, the "missed" exam did not lead to further harm, and Dr. Tate is entitled to summary judgment on this claim. See Hallett v. Morgan, 296 F.3d 732, 746 (9th Cir. 2002) (prisoner alleging delay of medical treatment evinces deliberate indifference must show that delay led to further injury.) Accordingly, Dr. Tate is entitled to summary adjudication on this claim.

### e.   Mistreatment by Dr. Tate During December 19, 2013 Examination

Plaintiff contends that at the December 19, 2013 examination, Dr. Tate was verbally "mean" to him and made him walk back to his cell without the use of a wheelchair, despite having had hematoma evacuation surgery four days prior. More specifically, Plaintiff alleges that at the December 19, 2013 examination, "Dr. Tate walked in upset telling Plaintiff that the only way the incision could have opened up was because Plaintiff cut it open himself, without checking the incision or the file." (Compl. at 6.) When Plaintiff continued to explain that the injury was caused by him sneezing, "Dr. Tate told Plaintiff to shut-up because he didn't care and he was doing the talking." (Compl. at 7.) After a quick observation of the incision site, Plaintiff asked the officers for a wheelchair and Dr. Tate said "No, you can walk back even if it hurts!" (Id.) Dr. Tate stated he didn't care if it hurt Plaintiff and if he fell on the way to his housing unit, the officers would pick him up. (Id.)

As an initial matter, verbal harassment or abuse alone is not sufficient to state a claim under section 1983, Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987), and threats do not rise to the level of a constitutional violation, Gaut v. Sunn, 810 F.2d 923, 925 (9th Cir. 1987). However, Plaintiff's claim goes beyond mere verbal statements.

Dr. Tate declares that he has no recollection of examining Plaintiff on December 19, 2013, and there is no record in Plaintiff's medical file reflecting such examination. (Tate Decl. ¶ 16.) Dr. Tate submits that had he examined Plaintiff on December 19, 2013, he would have created a note of examination and since there is no note he concludes that he did not examine him on such date. (Id.)

In opposition, Plaintiff submits and declares the following with regard to the December 19, 2013, visit:

On December 19, 2013 two officers escorted Plaintiff to the medical clinic for an appointment with Dr. Tate and other medical staff. The Plaintiff was helped onto the exam table. Dr. Tate walked in upset telling Plaintiff that the only way the incision site could have opened up was because Plaintiff cut it open himself. When the Plaintiff started to explain the sneezing which Dr. Yin and other medical staff said have been known to open incisions, Dr. Tate told Plaintiff to shut up because he didn't care and he was doing the talking. Plaintiff complied. Dr. Tate conducted a quick observation of the incision site with RN nurse and said the appointment was over. Plaintiff ask the officers for the wheelchair, but Dr. Tate angrily said, "no," you can walk back even if it hurts!" Plaintiff told Dr. Tate he was scared to walk back because when Plaintiff got surgery at Folsom and was forced to walk it created his testicular lump and left hernia and plus Plaintiff had been in bed rest, hasn't tried walking and the walk to his housing unit was over 100 yards and he could fall. Dr. Tate stated he didn't care and if he fell on the way to his housing unit the officers would pick him up and help him. Plaintiff reminded Dr. Tate on the day of surgery 12/6/13 you let officers and Rn nurse escort Plaintiff back to his cell why not now (see Exh. #23 CDC 7230 return from off-site medical care appointment dated 12/6/13, and CDC 7221 physicians orders form, and also see Exh. #21 CDC 7230 return form off-site medical care appointment form, dated 12/17/13 the Plaintiff was wheel chaired to his cell for recovery). Dr. Tate ignored Plaintiff and told the officers to get Plaintiff out of the office. Plaintiff was forced to walk back to his housing which was over 100 yards in severe agony and pain. Dr. Tate knew his decision would cause pain and suffering demonstrating deliberate indifference to serious medical need and leading to cruel and unusual punishment because Dr. Tate wanted to punish Plaintiff for his mistaken belief that Plaintiff hurt himself (see Exh. #24 CDC 7230 interdisciplinary progress notes dated 12/19/13-this is the day I was forced to walk over 100 yards. Dr. Tate or RN nurse never once discuss or state like this form says "If Plaintiff cannot ambulate Plaintiff would need to go to the "OHU" nor Plaintiff stated "He would be fine walking." If that was the case Plaintiff would have been escorted upon arrival to "OHU."

Returning from surgeries on 12/6/13 and on 12/17/13—why didn't medical staff inform Plaintiff of "OHU" returning from hospital because all times Plaintiff was wheel chaired to his cell for recovery[.]

(Opp'n at 134-136, Pl. Decl. ¶ 26.) Plaintiff acknowledges that he was instructed to ambulate but argues that does not mean to walk over 100 yards right out of bed rest from the hospital. (Opp'n at 17.) Plaintiff points out that upon return to CCI after the initial surgery on December 6, 2013, Plaintiff was transported across the yard back via wheelchair from the medical clinic. (Feinberg Decl., Ex. P.)

Dr. Tate has submitted evidence that on December 19, 2013, Plaintiff was examined by a registered nurse, not Dr. Tate. The December 19, 2013, medical note indicates that the nurse informed Plaintiff that upon discharge from the hospital it was recommended that he walk.[7] Plaintiff was also

---

[7] The December 16, 2013 hospital note documents that Plaintiff should walk three times a day. (UDF 41.)

advised that if he believed he could not ambulate and was in need of additional assistance, he could be placed in the Outpatient Housing Unit, which provided housing for inmates that require higher levels of medical care. The medical record indicates that Plaintiff refused the extra care and indicated he would be fine walking. (UDF 39.)

Defendant argues that Plaintiff suffered no long-term injury by having to walk 100 yard back to his cell; however, Plaintiff declares that by ordering him to walk over 100 yards back to his cell caused severe pain which is sufficient under the Eighth Amendment deliberate indifference standard. Although Dr. Feinberg declares that the hospitalization record documents that Plaintiff should walk three times a day (UDF 41), there is a genuine issue of material fact as to whether Dr. Tate was deliberately indifferent on December 19, 2013, by ordering him to walk 100 yards back to his cell just 2 days after surgery, and the Court cannot grant summary judgment in Dr. Tate's favor as the finding hinges on a credibility determination. See Jett v. Penner, 439 F.3d at 1096 (a prisoner need not show the harm was substantial); see also McGuckin, 974 F.2d at 1060 ("a finding that the defendant's activities resulted in 'substantial' harm to the prisoner is not necessary.") Based on the conflicting accounts of what transpired on December 19, 2013 relating to the treatment by Dr. Tate, the Court recommends that summary judgment be denied as to this claim.

2.    Defendant Dr. Yin

Plaintiff contends that Dr. Yin was deliberately indifferent to his serious medical needs by failing to send Plaintiff immediately to the hospital after he developed groin pain, eight days after his left-sided hernia surgery.

Defendant argues that Plaintiff cannot establish the requisite mental state because his actions demonstrate that he implemented a reasonable and conscientious plan to provide medical treatment to Plaintiff which he believed was appropriate.

It is undisputed that on December 14, 2013, at 5:35 p.m., Plaintiff went to the medical clinic complaining of pain in his groin area. (UDF 28.) The nurse documented that the surgical site was clean and dry, that the steri strips were intact and that there was no drainage. (Id.) The nurse also noted Plaintiff had some swelling at the surgery site. (Id.) At 6:05 p.m., the nurse contacted Dr. Yin, the on call physician, and documented that Dr. was returned to CCI to evaluate Plaintiff. (Id.) Dr. Yin

began his examination of Plaintiff at 6:414 p.m.  In his exam notes, Dr. Yin documented that Plaintiff was eight days post-surgery from a left inguinal herniorrhaphy, and that Plaintiff complained of painful swelling in his groin area, which Plaintiff claimed began following a sneezing attack.  (UDF 29.)  The progress notes documented that Plaintiff's left groin was notable for a non-fluctuant, 4X7 cm mildly tender swelling area and that Plaintiff did not have a fever.  (Id.)  Dr. Yin instructed Plaintiff to rest overnight and refrain from engaging in any straining activities.  (UDF 30.)  Dr. Yin also instructed Plaintiff to continue taking Tylenol #3 to alleviate pain, and renewed this prescription because it had expired the day before.  (Id.)  Dr. Yin also instructed Plaintiff to continue taking the Colace and Fiber-Lax.  (Id.)

Dr. Ying documented that he would return the following morning to evaluate Plaintiff's status and executed a physician order to facilitate this examination.  (UDF 31.)  Dr. Yin also ordered an appointment for Plaintiff to meet with his primary care provider in two days, and noted that Plaintiff already had a December 10, 2013, order to see the surgeon in 7 to 10 days from the order date.  (Id.)

On December 15, 2013, at approximately 1:40 a.m., Dr. Yin received a telephone call from a nurse at CCI stating that Plaintiff had returned to the clinic and that he was complaining of pain and had bleeding through the incision site.  (UDF 32.)  Dr. Yin instructed the nurse to make arrangements for Plaintiff to be transported to San Joaquin Community Hospital, and to start an IV so that IV access would be available, if needed.  (Id.)

At the hospital, Plaintiff's surgeon performed an evacuation of a left inguinal hematoma and a ligation of a bleeding vessel.  Plaintiff was discharged from the hospital on December 17, 2013.  (UDF 33.)

Plaintiff claims that Dr. Yin was deliberately indifferent to his medical needs because Dr. Yin told him at the initial exam that surgery was absolutely needed, but refused to send Plaintiff to the hospital.  (Opp'n at 142, Pl.'s Decl. ¶ 6.)  However, Plaintiff's claim is belied by the medical records.

Dr. Yin responded to the nurse's telephone call and returned to evaluate Plaintiff within 30 minutes on December 14, 2013.  (UDF 28, 29.)  At the initial visit on December 14, 2013, Dr. Yin conducted an examination, prescribed pain medication, and made plans to closely monitor Plaintiff over the next few days.  (UDF 30, 31.)  Indeed, Dr. Yin documented that he would return the

following morning to further evaluate Plaintiff's status and executed a physical order to such effect. (UDF 31.) When Dr. Yin was advised that Plaintiff's condition grew worse, he authorized the nurse to send Plaintiff to the hospital. (UDF 32.) The fact that Plaintiff's condition progressed rather than improved over the night is of no consequence to the prior medical treatment and evaluation provided by Dr. Yin. Moreover, had Dr. Yin sent Plaintiff to the hospital at the time of the initial examination on the evening of December 14, 2013, there would have been no difference in the outcome. (UDF 46.) Dr. Yin declares that "[b]ased on [his] observations of [Plaintiff's] condition, the records in his medical file, and [Plaintiff's] feedback, [he] determined there was no imminent need to send him to the hospital when [he] examined him on the evening of December 1[4]. Given his condition at that time, [he] believed that [his] decision to address [Plaintiff's] pain and monitor his progress over the subsequent 24 hours was a reasonable course of treatment." (Yin Decl. ¶ 10.)[8]

Plaintiff's lay opinion that Dr. Yin knew the constant swelling in his groin area was in fact bleeding does not demonstrate a genuine issue of material fact as to whether he was deliberately indifferent. Likewise, Plaintiff's belief that Dr. Yin should have immediately admitted him to the hospital at the initial visit on December 14, 2013, does not demonstrate deliberate indifference. Plaintiff has failed to submit evidence of any improper reason that Defendant Dr. Yin did not send Plaintiff to the hospital at the initial visit on December 14, 2013. While Plaintiff disagrees with Dr. Yin's decision, such disagreement does not give rise to a claim for deliberate indifference. See Estelle, 429 U.S. at 107 ("the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment."); see also Colwell v. Bannister, 763 F.3d at 1068 ("[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference.") In this instance, the medical record supports the finding that Dr. Yin did not act with deliberate indifference and summary judgment should be granted in his favor.

**V.**

---

[8] In paragraph 10 of Dr. Yin's declaration notes the initial examination as taking place on December 13, 2013, not December 14, 2013, as stated elsewhere. (Yin Decl. ¶ 10.) Given that there is no dispute the initial exam by Dr. Yin took place on December 14, 2013, the Court presumes the December 13, 2013, date was a typographical error.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      Defendant Dr. Tate's motion for summary judgment be granted in part and denied in part as follows:

a.      Granted as to Plaintiff's claims for failure to prescribe morphine, failure to examine, delay in surgery, forged refusal of treatment form on December 18, 2013;

b.      Denied as to Plaintiff's claim of mistreatment during December 19, 2013, examination; and

2.      Defendant Dr. Yin's motion for summary judgment be granted.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **September 1, 2017**

_____
UNITED STATES MAGISTRATE JUDGE